Jeremy A. Cohen
**SEYFARTH SHAW LLP**
620 Eighth Avenue
New York, New York 10018-1405
(212) 218-5500

Michael D. Wexler (to be admitted *pro hac vice*)
Justin K. Beyer (to be admitted *pro hac vice*)
**SEYFARTH SHAW LLP**
233 South Wacker Drive
Suite 8000
Chicago, Illinois 60606
(312) 460-5000

*Attorneys for Plaintiff Howmedica Osteonics Corp.,*
*a subsidiary of Stryker Corporation*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

------------------------------------------------------------ x
                         :

| | |
|---|---|
| HOWMEDICA OSTEONICS CORP., a New Jersey corporation and subsidiary of STRYKER CORPORATION, | : <br> : <br> : <br> : |
| Plaintiff, | : <br> : |
| - against - | : <br> : |
| MORGAN SCHILLING, a Colorado resident | : <br> : |
| Defendants. | : <br> : <br> : |

**COMPLAINT**

------------------------------------------------------------ x

      Plaintiff HOWMEDICA OSTEONICS CORP., through its Stryker Orthopaedics division

("Stryker"), a subsidiary of STRYKER CORPORATION, for its Complaint against Defendant

MORGAN SCHILLING ("Schilling"), states as follows:

## NATURE OF THE ACTION

1.     Stryker brings this action seeking injunctive relief and damages for the ongoing tortious and contract breaches made by its former managerial employee, Morgan Schilling. Stryker recently discovered that, while employed by Stryker, Schilling was also a part owner in a third-party distributor, ORP Surgical, LLC ("ORP"). Namely, during his Stryker employment from February 2006 through August 6, 2019, and unbeknownst to Stryker, Schilling breached his obligations to Stryker in a number of different ways. Those included: (a) using his Stryker management position to add competitive Acumed products, for his and ORP's sole benefit, to Stryker Trauma contracts; (b) attending surgeries for Acumed products as a Stryker manager; and (c) on information and belief, receiving bonuses and profits from ORP throughout this process as a part owner of ORP. All of this conduct grossly violated his fiduciary obligations to Stryker and the employment agreement he executed at the outset of his Stryker employment.

2.     Further, Stryker also recently discovered that, following Schilling's termination of employment from Stryker in August 2019, and contrary to his non-compete obligations, he began competing against Stryker and promoting Acumed products within ORP, including, but not limited to, training ORP sales representatives on how to sell Acumed products and compete against Stryker. These actions cost Stryker hundreds of thousands, if not millions, of dollars in losses. Accordingly, Stryker now seeks injunctive relief to enforce his non-compete obligations and to recover such monies paid to Schilling, which Schilling improperly received based on his tortious conduct and contractual breaches.

3.     By way of background, Stryker is a global leader in the development, manufacture, and sale of orthopaedic implants, instruments, and other orthopaedic products and services.

2

4.      The cornerstone of Stryker's sales of orthopaedic products is its salesforce, which is the face of Stryker to its surgeon customers. Stryker entrusts its sales force with confidential and proprietary business information—including information regarding its products, marketing, pricing, distribution, and sales strategies—as well as access to and knowledge of Stryker's customer base to enable its representatives to sell its products. As a byproduct of this trust and repose, Stryker expects and requires that its sales representatives act in Stryker's best interests and not aid competitors at the expense of Stryker's business.

5.      To protect its confidential and proprietary information and customer relationships, Stryker requires its sales representatives to agree to reasonable employment and post-employment restrictions as a condition of employment.

6.      To that end, at the outset of Schilling's employment with Stryker, he signed a non-compete agreement whereby he agreed that, during the course of his employment and for one year after his termination, Schilling would not: (a) compete against Stryker in his former Stryker territory; (b) solicit Stryker's customers within his former Stryker territory; and/or (c) utilize or disclose Stryker's confidential information and/or trade secrets.

7.      While employed as a Stryker sales manager, Schilling serviced Stryker's customers in Colorado and Wyoming. Schilling worked for Stryker for approximately 13 years until August 6, 2019.

8.      Stryker recently discovered that, both during his Stryker employment and after it ended, Schilling violated his Agreement by: (a) possessing an ownership interest in ORP (a Stryker third-party distributor that carried certain competitive products) while he was employed by Stryker; (b) improperly soliciting Stryker surgeons and hospital customers to use competing surgical products represented by ORP, namely competing orthopaedic products manufactured by

Acumed, during his Stryker employment; (c) hiding his competitive activities by including Acumed products on a Stryker contract with at least one Stryker customer; (d) following termination of his Stryker employment and during his non-compete period, training ORP sales representatives on how to utilize and sell Acumed products, which constituted a breach of his non-compete provision; and (e) using and disclosing Stryker's confidential and trade secret information.

9.      These revelations are all the more disconcerting given that, during his Stryker employment, Schilling was accused numerous times of having an ongoing relationship with ORP, which he continuously denied, including on no less than eight occasions from 2011 through the end of his Stryker employment. Stryker investigated each of these accusations internally when they were made.

10.      Based on the information that Stryker uncovered to date, Schilling's scheme with ORP lasted for years, and included Schilling covering Acumed cases on ORP's behalf, while directly employed by Stryker. This conduct was prohibited by Stryker. Moreover, Stryker has information indicating that Schilling, while employed by Stryker, encouraged ORP sales representatives to sell Acumed products instead of Stryker's products through different commission structures associated with such Acumed sales. On information and belief, as an owner of ORP, Schilling received more money based on ORP's sales of Acumed products than corresponding Stryker sales, while, at the same time, Schilling was being paid salaries and bonuses based on Stryker sales, meaning that Schilling was double-dipping based on his scheme. Further, unbeknownst by Stryker, functioned as a day-to-day manager over ORP's sales force. All of these activities were performed without Stryker's knowledge or permission.

11.     Further, in May 2020, Stryker uncovered evidence indicating that, in February 2018, while negotiating purportedly on Stryker's behalf, Schilling negotiated the inclusion of competing Acumed products that would be placed on a Stryker Trauma Inventory Agreement ("TIA") with a major hospital in Colorado. In other words, Schilling was tasked with and paid to exclusively negotiate on Stryker's behalf, but, apparently as an owner of ORP, also negotiated that competing trauma products from Acumed also be included in the Stryker trauma contract. Any sales to Acumed instead of Stryker adversely affected Stryker and directly benefitted Schilling. But beyond the financial loss, Stryker was also substantially damaged from a reputational and goodwill standpoint, given that Schilling, a Stryker Sales Manager, was competing against it on behalf of a Stryker competitor.

12.     On information and belief, Schilling's efforts on ORP's behalf began at least as early as August 2013. This belief is based on a document that ORP filed in a lawsuit on June 2, 2020, against one of its former independent contractor sales representatives, showing that Schilling, as early as August 2013 held a 25 percent option for ORP and apparently shared in ORP's profits.

13.     Prior to Schilling's resignation from Stryker, effective August 6, 2019, Stryker was unaware of either Schilling's efforts on ORP's behalf or Schilling's ownership interest in ORP. As a result of this, based on Schilling's representation that he was not taking competitive employment, and to ensure his compliance with the non-competition obligations, Stryker paid Schilling severance payments as outlined in the Agreement.

14.     Despite his contractual obligations to Stryker, though, Schilling actively worked against Stryker's interests by directly promoting Acumed and providing other ORP sales representatives training on how to promote and use Acumed products.

15.     When Stryker discovered Schilling's conduct, it sent him a letter requesting that he affirm, by affidavit, that he had no ownership/financial interest in ORP during his Stryker employment. Rather than respond to that request, Schilling simply denied that he improperly trained ORP sales representatives.

16.     Based on what Stryker learned to date, Stryker is seriously concerned that Schilling used his position of authority within Stryker to steer Stryker customers into entering into agreements that included Acumed products, on ORP's behalf and unbeknownst to Stryker. As a byproduct of such activity, Stryker has been financially damaged insomuch as it lost sales that should have been for Stryker's exclusive benefit, as well as losing the value of its confidential information, trade secrets, goodwill, and reputation. Furthermore, Stryker paid Schilling several hundreds of thousands of dollars during and after his Stryker employment ended to abide by his non-compete obligations, all the while he was surreptitiously working on a competitor's behalf for his own gain.

17.     Accordingly, Stryker now brings this complaint sounding in breach of contract, breach of fiduciary duties, and unfair competition to obtain injunctive relief and to recover the monies that Schilling improperly received.

## PARTIES

18.     Howmedica Osteonics Corp. is a corporation organized and existing under the laws of the State of New Jersey, with its principal place of business in Mahwah, New Jersey.

19.     Schilling is a citizen of Colorado, who, on information and belief, is domiciled at and resides in Bow Mar, Colorado.

## JURISDICTION AND VENUE

20.     This Court has original jurisdiction over this action under 28 U.S.C. § 1332 because the parties are citizens of different states and the matter in controversy exceeds

$75,000.00, excluding interest and costs. Supplemental jurisdiction also exists over each of the claims under 28 U.S.C. § 1367 and none of the exceptions to § 1367 apply.

21.     This Court has personal jurisdiction over the Defendant and venue is proper in this District under 28 U.S.C. § 1391(b).

22.     Personal jurisdiction exists over Schilling. Pursuant to Section 12 of the Agreement, Schilling consented to and agreed that any and all litigation between Stryker and Schilling shall take place in New Jersey. Moreover, general personal jurisdiction and specific personal jurisdiction exist against Schilling based on his contacts with New Jersey during his employment with Stryker as well as his tortious acts leveled against Stryker, the direct effect of which is felt in New Jersey.

## EVENTS GIVING RISE TO THIS ACTION

### I.     STRYKER'S BUSINESS

23.     Stryker is a global leader in the development, manufacture and sale of orthopaedic implants, instruments, and other orthopaedic products and services, including a full range of reconstructive and trauma products.

24.     Orthopedic trauma products are used for the surgical treatment of bone fractures, abnormalities and diseases of the hands, arms, shoulders, hips, pelvis, legs, ankles, and feet ("Trauma").

25.     The orthopaedic medical device industry is highly competitive. Stryker and its products, however, have broad appeal and acceptance in the market, including, specifically, the Trauma markets. Stryker is dedicated to the continual development of innovative technologies to help meet surgeons' and patients' needs, making Stryker an industry leader.

26.     Stryker sells its products through sales representatives, who are the face of Stryker to its customers and a key component of its success. In certain situations, Stryker also engages third-party distributors to distribute certain of its products in specific territories as well.

27.     In Colorado, through May 3, 2020, Stryker both engaged direct sales representatives through its Stryker Summit Surgical Branch, as well as utilized a third-party distributor, ORP. Based on its relationship with ORP, Stryker continued to possess the customer relationships, negotiated contracts with Stryker customers, fulfilled customer orders placed through ORP, and billed and collected monies due based on surgeries performed through ORP.

28.     Because of the surgeon's reliance upon Stryker sales representatives to provide technical assistance and detailed product information both during and following medical procedures, the relationships developed between the Stryker sales representatives and the surgeon customers is significant.

29.     Thus, the role of a sales representative is more than simply "selling", i.e. discussing pricing, differentiating a competing product, etc. These individuals meet with surgeons to show them Stryker's portfolio of products and speak to the products' capabilities. They are present during surgical procedures and trained by Stryker to provide technical assistance to the surgeons and medical staff regarding the safe and effective use of Stryker products.

30.     Over time, by demonstrating knowledge of the technical product information, specifications, and safe and effective uses, sales representatives gain their assigned surgeons' trust and confidence in Stryker and its products. In order to provide this level of service, Stryker sales representatives spend significant time with their assigned surgeons to develop detailed

65053269v.1

knowledge of surgeon preferences, common procedures, and which Stryker products will best meet their needs.

31.     Moreover, because of these relationships, Stryker places significant trust and repose in its sales representatives and sales managers, like Schilling, to negotiate contracts, protect Stryker's confidential information, and act in the best interests of Stryker in the territory in which they are assigned.

32.     Stryker expects that Stryker sales representatives and managers will not engage in any activity that would deprive Stryker of his or her duty of loyalty or interfere with the satisfactory performance of his or her duties. In particular, employees may not promote competitive products or maintain an ownership interest in competitive companies or third-party distributors that Stryker engages. Such obligations are clearly set forth in Stryker documents, are provided to Stryker sales representatives and managers on a regular basis, and Stryker employees are required to affirm on a regular basis that they do not own or possess an interest in a competitive company.

33.     Because of the highly technical nature of the work and the long-standing customer relationships Stryker develops, access to Stryker's confidential and proprietary product information and/or trade secrets is critical to a sales representative's success.

34.     Further, to ensure that its sales representatives are equipped with the information and skills necessary to compete in the marketplace, Stryker makes substantial, continuous investment in the training and education of its sales force to ensure that the sales representatives are equipped with comprehensive product information.

35.     These trainings take place in various forms and forums, including initial training for newly hired reps, weekly and monthly meetings, and at Stryker's annual and mid-year

National Sales Meetings, where Stryker shares with the entire sales force confidential and proprietary information relating to its products, sales programs, and other company-wide strategies, including new product development, long and short-term strategic sales plans, and other confidential competitive strategies.

36.     Beyond training, the day-to-day functions of a sales representative require access to and use of confidential and proprietary strategic information. This strategic information includes Stryker's:

   a.  Equipment placement strategies;

   b.  Marketing plans and promotional strategies for the region;

   c.  Pricing strategies, including terms and conditions of sales, profit margins, product pricing discounts, bulk purchase pricing;

   d.  Customers' contract terms and preferences;

   e.  Competitive strategies, including those against companies like Acumed; and

   f.  Customer retention strategies, including strategies for withstanding competitive pressure from other Trauma or Recon companies.

37.     Stryker's sales representatives are entrusted with this confidential information and are expected to use this information exclusively to enhance and promote Stryker's relationships with its surgeon and hospital customers for Stryker's sole benefit.

38.     Stryker's reputation—and ultimately its financial success—is dependent upon the ability of its sales representatives to use this information to foster the company's existing customer relationships, and help it identify and develop new ones.

39.     Indeed, while Stryker provides its sales representatives with substantial information, it also trusts and relies on these individuals to acquire, on its behalf, other forms of confidential and proprietary information, such as specific surgeon preferences.

65053269v.1

40.     In order to provide truly exceptional customer service and maintain strong customer relationships, a sales representative must know and understand surgeon preferences. Specifically, each surgeon has preferred products and methods and also has his or her own protocol in the operating room. This information is constantly evolving and is not generally available to the public.

41.     Accordingly, it is of great value to Stryker, and any Stryker competitor that acquires such information would obtain with it an unfair competitive advantage.

## II.     STRYKER'S PROTECTION OF ITS CONFIDENTIAL INFORMATION AND TRADE SECRETS

42.     Stryker closely guards its confidential information and trade secrets, and takes specific measures to restrict access to and preserve the confidentiality of this information, including, but not limited to, the following:

a.  Requiring employees to sign confidentiality and/or non-compete agreements, both of which contain covenants designed to maintain confidentiality and to return Stryker's property upon termination;

b.  Requiring its employees to maintain confidentiality of Stryker's information and protect Stryker's assets;

c.  Prohibiting the use of Stryker's computer systems for non-company purposes;

d.  Restricting access to computerized information through the use of passwords;

e.  Prohibiting the unauthorized physical removal of company information (via paper, disc, flash drive or other media) and electronic transmission of such information (via email or other means); and

f.  Restricting access to computerized company information based on each individual employee's "need to know" the particular information.

43.     Stryker rigorously maintains the confidentiality of its information because the information provides Stryker a competitive advantage in the marketplace from which Stryker derives economic value.

44.     Any Stryker competitor—including Schilling—who used this confidential information against Stryker, and on behalf of a competitor, would gain an immediate and unfair competitive advantage by virtue of the fact that it would, among other improper advantages: (1) develop trade secret and confidential and proprietary information without expending any time or resources, let alone the same degree of time and resources that Stryker did; and (2) utilize Stryker's confidential pricing or doctor preferences to unfairly compete against Stryker.

## III.     SCHILLING'S CONTRACTUAL OBLIGATIONS TO STRYKER

45.     In consideration of employment with Stryker as a Sales Manager, Schilling executed the Howmedica Osteonics Corp. Employee Non-Compete Agreement (the "Agreement"). (A true and correct copy of the Agreement is attached as Exhibit 1.) Schilling's Stryker employment was contingent on him signing the Agreement.

46.     Through the Agreement, Schilling agreed to maintain the confidentiality of Stryker's confidential information during the course of his Stryker employment and following termination of that employment. (Agreement at p. 1-2.)

47.     Schilling further agreed that, "by virtue of [his] employment," he was gaining access to Stryker's "confidential and trade secret information." (Id. at p. 1.)

48.     The Agreement defined Stryker's confidential information to be:

   a.   Information relating to Stryker's "operations, administrative and training processes and procedures, financial information, products (including the technical aspects and materials composition thereof), pricing formulae, manufacturing processes, research and development programs, efficacy testing, analysis of competitive products and information concerning specialized product development and test product lines;

   b.   "Sales and marketing strategies",

   c.   "[Stryker]'s customers (including but not limited to customer lists, pricing information, product information, analytical results of competitive product comparisons, customer marketing data and purchasing patterns, applicable

discount codes, and planned research and development for its customer base in the Sales and Marketing Region)",

d. "corporate, strategic and business data", and

e. "any other formula, pattern, device or compilation of information which is used in the business of the Stryker Group and which gives Stryker Orthopaedics an opportunity to obtain an advantage over its competitors who do not know or use it."

(Id. at p. 2.)

49.     Schilling also agreed that, during and following his Stryker employment, he would not divulge or engage or participate in competitive activity that would require him to reveal or use Stryker's Confidential Information. (Id. at p. 2.)

50.     Beyond agreeing to maintain the confidentiality of Stryker's information, Schilling also agreed to certain reasonable post-employment restrictive covenants.

51.     Specifically, Schilling agreed that, during his employment and for one year after the termination of his Stryker employment—whether his termination was voluntary or involuntary or with or without cause—he would not: (a) compete against Stryker; (b) solicit Stryker's customers; or (c) attempt to cause Stryker's customers to alter or terminate their relationship with Stryker. (Agreement at § 1(a) - (b).)

52.     The Agreement includes certain definitions, further explaining the extent of the restrictions. For example, it defines the term "customer" to apply to "any of [Stryker]'s customers [] that [Schilling] contacted, targeted as a potential prospect or serviced, directly or indirectly, while in the employ of [Stryker]." (Id. at § 1(a).)

53.     The Agreement includes reasonable geographic restrictions, which is limited to the sales territory in which Schilling worked or had responsibilities during the twelve (12) months prior to his termination. (Id. at § 1.)

54.     Moreover, the Agreement contained a severance payment provision, which

13

Stryker paid from the date of Schilling's termination through April 15, 2020, when it discovered that Schilling was and is breaching the terms of his Agreement. (Agreement, §3.) Moreover, per the terms of the Agreement, Stryker is still entitled to enforce the restrictive covenants, despite not being required to continue to pay Schilling severance payments. (Id., § 3(d).)

55.     Stryker and Schilling also agreed: (a) to waive a trial by jury (Id., § 11); (b) that "any and all litigation between [Schilling] and [Stryker] … shall take place in the State of New Jersey", with Schilling expressly consenting "to the jurisdiction of the federal and/or state courts in New Jersey (Id., § 12); (c) that New Jersey law would apply (Id., § 13); and (d) that a breach would cause Stryker irreparable harm (Id., § 10).

## IV.     SCHILLING'S EMPLOYMENT AT STRYKER

56.     Schilling's employment with Stryker began on or about February 27, 2006. During his employment with Stryker, he served as a Stryker Sales Manager for Stryker Orthopaedics in the Denver, Colorado marketplace, which included Colorado and Wyoming. Prior to working for Stryker, and based on his LinkedIn profile, Schilling worked for ORP for approximately four years as a sales representative and sales manager.

57.     While Schilling had background with certain Stryker products based on his affiliation with ORP, Stryker continued to invest significant time and resources in training and developing Schilling as a Sales Manager, and on the products that Stryker continued to develop, manufacture, and distribute after his Stryker employment began.

58.     Moreover, based on the manner in which Stryker's relationship with ORP was structured, Schilling, while engaged by ORP, had access to certain Stryker customer relationships. That said, when Schilling began his Stryker employment, Stryker entrusted him with new and additional highly-valuable customer relationships, which continued to grow over the course of his 13-year employment relationship with Stryker.

14

65053269v.1

59.     Further, because of his position with Stryker, Schilling also had significant access to the work being performed on Stryker's behalf purportedly by ORP.

60.     Additionally, based on his employment with Stryker, Schilling went through various two-week and follow-up training courses with Stryker, enabling him to learn Stryker's Trauma product lines.

61.     Through the trust and repose Stryker placed in him, Schilling was exposed to and formed business relationships with Stryker's customers and was exposed to and helped develop on Stryker's behalf further confidential information regarding such doctors and surgeons.

62.     To perform his responsibilities effectively, Stryker gave Schilling access to confidential and proprietary information concerning Stryker's: (i) operations, products, pricing formulae, manufacturing processes, research and development activities, efficacy testing, and analysis of competitive products; and (ii) customers, including, but not limited to, customer lists, customer preferences, strategies for soliciting prospective customers, pricing information, analytical results of competitive product comparisons, customer marketing data and purchasing patterns, applicable discount codes and planned research and development for its customer base.

63.     In addition to confidential information relating to Stryker's products and customers (noted above), Schilling also had access to highly confidential information regarding Stryker's sales representatives in his region and in the Stryker Orthopaedics division, including, among other things, the specific surgeons and hospitals certain sales representatives were targeting; sales history broken down by territory, representative, product and customer; and specific sales quotas and whether certain sales representatives reached or exceeded their quotas.

64.     Schilling's access to this highly confidential information and his continued employment with Stryker was based on Schilling's duty of loyalty to Stryker, his repeated

express assurances, and his annual written certifications that he had no conflicts of interest with Stryker.

65.     Moreover, given Schilling's position, which did require him to interact with ORP on a daily basis and his prior engagement with ORP, Stryker had no reason to disbelieve Schilling at that time.

## V.     SCHILLING VOLUNTARILY RESIGNS HIS STRYKER EMPLOYMENT

66.     Effective August 6, 2019, Schilling voluntarily resigned his employment with Stryker.

67.     At the time of his resignation, Schilling refused to disclose his new employer or a description of his anticipated duties. To that end, on August 5, 2019, in-house counsel for Stryker wrote Schilling, reminding him of his obligations and requesting that he disclose the identity of his new employer. (A true and correct copy of the August 5, 2019 letter is attached as Exhibit 2.)

68.     On August 13, 2019, Schilling responded to the August 5, 2019 letter, and claimed that he was not taking employment at that time and was "currently evaluating future options and do not have" information relating to his new employer. (A true and correct copy of Schilling's August 13, 2019 email is attached as Exhibit 3.) In that same email, Schilling informed Stryker that he would "notify Stryker immediately with identity and scope per agreement" when he made "a decision regarding [his] future employment." (Id.)

69.     Based on the same, starting in September 2019, Stryker began paying Schilling severance payments pursuant to Section 3 of the Agreement. Based on Schilling's representations, Stryker began paying Schilling approximately $29,000 per month pursuant to the severance payment term of his Agreement.

16

70.     But, as discussed below, like so many times before, Schilling's representations were apparently false.

71.     As a result of documents made available through subsequent publicly-filed lawsuits, Stryker learned that Schilling had a Grant of Conditional Option and Agreement to Acquire Membership Interest, which was dated August 1, 2013, and possessed a 25 percent ownership interest in ORP. (A true and correct copy of the publicly filed document is attached as Exhibit 4.)

72.     This was particularly disconcerting because, over the course of 2011 through 2019, Schilling, on no less than eight (8) occasions, told Stryker that he did not possess a membership interest in a competitor, including ORP. This included at least five instances between 2015 and 2019 in which Schilling certified to Stryker, in writing, through its conflict of interest form, that he did not have an ownership interest in any medical device company or distributor.

73.     Around this same time, Stryker was made aware that, contrary to his representations about having no employment with ORP and contrary to his non-compete obligations, Schilling was training ORP sales representatives on how to utilize and sell competitive Acumed trauma products that directly competed with Stryker products. Both actions constitute a breach of Schilling's obligations to Stryker.

74.     Concerned that Schilling had lied about his dealings with ORP, on May 13, 2020, Stryker sent Schilling a letter identifying its concerns pertaining to both Schilling's ownership interest in ORP and his improper competition against Stryker. Through the letter, Stryker requested that Schilling execute an attached affidavit, confirming that he possessed no ownership

interest in ORP and had taken no activities competitive to Stryker's interests on ORP's behalf. (A true and correct copy of Stryker's May 13, 2020 letter is attached as Exhibit 5.)

75.     Schilling refused to sign the declaration, and, as a result of the same, Stryker ceased paying Schilling the severance payment, which, up to the point at which it discovered his malfeasance, Stryker paid Schilling $238,251.59 in severance payments pursuant to the Agreement.

76.     Despite Schilling's refusal to confirm compliance with the Agreement, Stryker's investigation into his alleged bad acts continued. What Stryker uncovered showed that Schilling was improperly competing directly against Stryker both during and after his Stryker employment.

77.     In particular, Stryker discovered that, in February 2018, Schilling used hsis Stryker relationship with a major Colorado hospital to negotiate a Trauma Instruments Agreement ("TIA") to include a mix of Stryker products and competitive Acumed products to Stryker's detriment.

78.     By negotiating Stryker's TIA to include competitive Acumed products, Schilling was actively working against Stryker's best interests and diverting sales to Acumed. Stryker is unaware how frequently Schilling engaged in such activity during his 13-year Stryker career or how many sales Stryker lost as a result of Schilling's scheme.

79.     What is clear, however, is that Stryker has been irreparably harmed by Schilling's conduct. Stryker's customer relationships and goodwill have been irreparably damaged through Schilling, a then-Stryker Sales Manager, operating as a double agent, negotiating on behalf of a competitor, all while purportedly working for Stryker's best interests.

80.     Moreover, Stryker lost at least several hundreds of thousands of dollars, based on the severance payments to which Schilling received but was not entitled, based on his improper conduct.

81.     Stryker estimates millions of dollars in losses over the course of Schilling's 13-year Stryker career, during which it is believed that Schilling was using his managerial position with Stryker to negotiate the inclusion of competitive products, on ORP's behalf, on Stryker's TIAs with Colorado and Wyoming hospitals to Stryker's detriment.

82.     In furtherance of evaluating Schilling's conduct, Stryker recently also learned about the following:

a.   Schilling receiving an email from ORP in April 2015, on his personal email account,  relating to ORP's business strategy to link "Stryker and Acumed events" with surgeons as part of ORP's bonus plan, at a time he was a Stryker sales manager;

b.   Schilling receiving an email from ORP in August 2015, while employed as a Stryker sales manager, on his personal email account, relating to a pricing proposal from Ortho Align to ORP, attaching various documents to allow ORP and Schilling to better promote Ortho Align's products. Ortho Align is a competitor of Stryker, and Schilling was prohibited from working on competitive products;

c.   Schilling receiving an email from ORP in October 2017, on his personal email account, where ORP was informing Schilling, a Stryker sales manager, about Acumed training opportunities and inviting him to attend such training;

     d.   Schilling receiving an ORP memo to "ORP Surgical, LLC Owners", with the subject "ORP Surgical Owners Meeting", and discussing ORP's Q4 profit distribution, which Schilling signed on or about September 26, 2017, at a time he was a Stryker sales manager and further at a time before which he represented on at least 5 occasions that he had no ownership/financial interest in ORP; and

     e.   Schilling receiving an email from ORP in February 2020 relating to "Acumed Business Plans 2020" on his personal email account, through which he was asked to identify his business plan and conversion targets relating to Acumed;

83.    In addition to the above, following Schilling's departure, in violation of his one-year non-compete obligations, Stryker is further informed and believes that Schilling trained other ORP sales representatives on how to use and sell Acumed products, which further cost Stryker business and which was in violation of Schilling's obligations owed through the Agreement.

84.    All told, Schilling is causing, threatening, and/or will continue to cause or threaten significant irreparable harm to Stryker, including the loss of long-standing customer relationships, the loss of goodwill, as well as damage to its reputation as an industry leader, its market share, and its ability to successfully market its goods and services. Remedies at law are inadequate and cannot make Stryker whole, but Stryker has been significantly damaged from a monetary standpoint as well.

## COUNT I
## BREACH OF CONTRACT

85.    Stryker hereby repeats, realleges, and incorporates by reference the allegations which are contained in Paragraphs 1 through 84.

86.    The Agreement that Schilling entered into with Stryker constitutes a valid and

enforceable contract.

87.     Stryker performed all of its duties and obligations under the Agreement.

88.     The Agreement prohibits Schilling from soliciting Stryker's customers, engaging in competitive behavior against Stryker, or using Stryker's confidential, proprietary, and trade secret information.

89.     In breach of the Agreement, Schilling has and continues to solicit Stryker's customers on behalf of ORP for use of Acumed products.

90.     In further breach of his Agreement, Schilling has and is improperly competing against Stryker by misusing his managerial position with Stryker to negotiate the addition of Acumed products in Stryker TIAs, holding an ownership/financial position with ORP during his Stryker employment, and training ORP sales representatives on how to use and sell Acumed products during his one-year non-compete.

91.     On information and belief, based on Schilling's improper negotiations to add Acumed products to Stryker TIAs during his Stryker employment, Stryker is informed and believes that Schilling misused its confidential, proprietary, and trade secret pricing information, at a minimum, to undercut Stryker's pricing and to make Acumed products more appealing.

92.     Stryker's belief as to this is further supported by information that Stryker has received indicating that ORP received a higher commission percentage from the sale of Acumed products and that ORP would push the sale of Acumed products over the sale of Stryker products. Based on this, Stryker is informed and believes that, based on his ownership interest in ORP and the receipt of monies associated with that ownership interest, Schilling was incentivized and did also push the sale of Acumed products to the detriment of Stryker products, based on his receipt of commissions and bonuses associated with the same.

93.     As a result of Schilling's breaches, Stryker has been irreparably injured, and it continues to face irreparable injury. Stryker has lost and is threatened with continuing to lose the value of its confidential, proprietary, and trade secret information, customer relationships, and goodwill, for which a remedy at law is inadequate.

94.     Accordingly, Schilling should be enjoined and restrained by Order of this Court.

95.     Additionally, Stryker also seeks actual, incidental, compensatory, punitive and consequential damages, to the extent that certain of Stryker's damages are quantifiable, as well as repayment of the severance payments that Schilling received from Stryker, which were received while he was breaching the Agreement and fees and costs.

## COUNT II
## BREACH OF FIDUCIARY DUTY

96.     Stryker hereby repeats, realleges, and incorporates by reference the allegations which are contained in Paragraphs 1 through 84.

97.     As an employee and Stryker Sales Manager, Schilling had a duty to act in good faith and solely for the benefit of Stryker in all matters within the scope of his employment.

98.     Schilling's fiduciary duties included (but were not limited to): (1) the duty to guard and not misuse confidential and proprietary information of Stryker; (2) to devote best efforts to the business of Stryker; (3) to not operate a competitive business while employed by Stryker; and (4) to not interfere with or usurp business opportunities belonging to Stryker.

99.     Schilling breached his fiduciary duties to Stryker by, among other things: (1) failing to protect the interests of Stryker; (2) misusing Stryker's confidential and proprietary information; (3) operating and obtaining pecuniary gain from a competing medical business while employed by Stryker; (4) misusing Stryker's contract negotiations to piggy-back competitor's products into Stryker's agreements and deals at Stryker's expense and for the

22

benefit of Schilling and ORP; and (5) interfering with and usurping Stryker's business opportunities.

100.    Stryker has been and continues to be damaged by Schilling's wrongful conduct.

101.    As a result of Schilling's actions, Stryker has suffered damages in an amount to be determined at trial.

102.    Because Schilling's actions have been willful, malicious, outrageous, oppressive, or done in complete disregard of the consequences they might have upon Stryker, the award of exemplary and punitive damages in an amount proven at trial is proper as well as fees and costs

## COUNT III
## UNFAIR COMPETITION

103.    Stryker hereby repeats, realleges, and incorporates by reference the allegations which are contained in Paragraphs 1 through 84.

104.    Schilling took the actions described above to gain an unfair competitive advantage over Stryker.

105.    Schilling willfully and maliciously took the actions described above with knowledge of and disregard for Stryker's rights, and with the intention of causing harm to Stryker for his own benefit.

106.    As a result of Schilling's actions, Schilling is unfairly competing in the trauma marketplace in at least Colorado and Wyoming.

107.    Stryker has been irreparably injured and it continues to face irreparable injury. Stryker is threatened with losing the value of its confidential and proprietary information and certain customer relationships, along with income and goodwill, for which a remedy at law is inadequate.

108.    Accordingly, Schilling should be enjoined and restrained by Order of this Court. In addition to a remedy at equity, Stryker seeks actual, incidental, compensatory, punitive, and consequential damages as well as fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, Howmedica Osteonics Corp. seeks judgment in its favor and against Defendant Morgan Schilling and an order which:

(1)    Preliminarily and permanently enjoins Schilling and all parties in active concert or participation with him, including ORP Surgical LLC, from directly or indirectly engaging or participating in any employment or activity competitive with Stryker that is directed or designed to solicit, divert, or alter the business relationship with any Stryker customer that Schilling contacted, targeted as a potential prospect or serviced while in the employ of Stryker within the territory in which Schilling serviced twelve (12) months prior to termination of his Stryker employment;

(2)    Preliminarily and permanently enjoins Schilling, and all parties in active concert or participation with him, including ORP, from directly or indirectly soliciting, inducing, or influencing, or attempting to solicit, induce, or influence any Stryker customer that Schilling contacted, targeted as a potential prospect, or serviced while in the employ of Stryker within the territory in which Schilling serviced twelve (12) months prior to termination of his employment with Stryker to alter or terminate its business relationship with Stryker;

(3)    Preliminarily and permanently enjoins Schilling, and all parties in active concert or participation with him, including ORP, from directly or indirectly using or disclosing any of Stryker's confidential, proprietary, or trade secret information they obtained and/or had access to while employed by Stryker;

(4)    Orders Schilling, and all parties in active concert or participation with them, including ORP, to return to Stryker all originals and copies of all files, devices, and/or documents that contain or relate to Stryker's confidential, proprietary, or trade secret information;

(5)    Awards Stryker actual, incidental, compensatory, exemplary, punitive, and consequential damages in an amount to be determined at trial;

(6)    Awards Stryker its costs and expenses incurred herein;

(7)    Orders Schilling to disgorge any and all compensation paid to him by ORP, during the period of his improper activities;

(8)    Orders Schilling to repay any and all separation payments paid to him by Stryker;

(9)     Awards Stryker pre- and post-judgment interest;

(10)    Award attorney's fees and costs; and

(11)    Awards Stryker any other legal or equitable relief just and appropriate under the circumstances.

**SEYFARTH SHAW LLP**


By:     /s/ Jeremy A. Cohen
        Jeremy A. Cohen
620 Eighth Avenue
New York, New York 10018-1405
(212) 218-5500

Michael D. Wexler (to be admitted *pro hac vice*)
Justin K. Beyer (to be admitted *pro hac vice*)
233 South Wacker Drive, Suite 8000
Chicago, Illinois  60606
(312) 460-5000

*Attorneys for Plaintiff Howmedica Osteonics Corp.,*
*a subsidiary of Stryker Corporation*

Dated:  July 29, 2020

## CERTIFICATION PURSUANT TO L. CIV. R. 11.2

I certify that, to the best of my knowledge, this matter is not the subject of any other action pending in any court or of any pending arbitration or administrative proceeding.

**SEYFARTH SHAW LLP**

By:   /s/ Jeremy A. Cohen
      Jeremy A. Cohen
620 Eighth Avenue
New York, New York 10018-1405
(212) 218-5500

Michael D. Wexler (to be admitted *pro hac vice*)
Justin K. Beyer (to be admitted *pro hac vice*)
233 South Wacker Drive
Suite 8000
Chicago, Illinois  60606
(312) 460-5000

*Attorneys for Plaintiff Howmedica Osteonics Corp.,
a subsidiary of Stryker Corporation*

Dated:  July 29, 2020

26