# EXHIBIT 1

**COLORADO**

## HOWMEDICA OSTEONICS CORP.
## D/B/A STRYKER HOWMEDICA OSTEONICS

### EMPLOYEE NON-COMPETE AGREEMENT
(Branch Manager / Sales Manager)

This Agreement is made this ___16___ day of ___Feb.___, 20_20_, between HOWMEDICA OSTEONICS CORP. D/B/A STRYKER HOWMEDICA OSTEONICS ("Company") and **Morgan Schilling** ("Employee").

By executing this Agreement, Employee recognizes and agrees that Employee (1) is or will be employed in a supervisory position with Company in which Employee will be trained to perform work which involves, directly or indirectly, the marketing, distribution and sale of highly specialized products to a valuable customer base, and (2) is or will be employed in a position with Company in which Employee will have direct and/or indirect contact with Company's product agents, product distributors, sales offices, sales representatives and valuable customers.

Employee acknowledges that he/she will be reposed with certain responsibilities for the geographical and territorial areas that are assigned to Employee by Company from time to time, within which Company's valuable customers are serviced by Company's product agents, product distributors, branch sales offices and/or sales representatives (collectively, the "Sales and Marketing Region"). Employee understands that his/her selection to provide services to Company and its valued customers; his/her employment and the continuation of his/her employment; the provision of training to him/her by Company; his/her compensation and continued compensation are all expressly conditioned on Employee agreeing to abide by the covenants set forth in this Agreement.

Employee further recognizes that by virtue of his/her employment, he/she will be given access to confidential and trade secret information concerning (1) Company and its affiliates which

575678.02

are involved in Company's orthopedic implants business (collectively, the "Stryker Implant Group"), including information relating to their business operations, administrative and training processes and procedures, financial information, products (including the technical aspects and materials composition thereof), pricing formulae, manufacturing processes, research and development activities, efficacy testing, analysis of competitive products, and information concerning specialized product development and test product lines, (2) Company's sales and marketing strategies in the Sales and Marketing Region, (3) Company's customers (including but not limited to customer lists, pricing information, product information, analytical results of competitive product comparisons, customer marketing data and purchasing patterns, applicable discount codes, and planned research and development for its customer base in the Sales and Marketing Region), (4) corporate, strategic and business data concerning the Stryker Implant Group and (5) any other formula, pattern, device or compilation of information which is used in the business of the Stryker Implants Group and which gives Company an opportunity to obtain an advantage over its competitors who do not know or use it. This Confidential Information is provided to Employee for use only in the course of Employee's employment with, and for the benefit of, Company.

Employee is aware that Company is reposing trust in Employee in providing Employee with confidential, proprietary and trade secret information and in providing Employee with access to Company's Sales and Marketing Region and its valuable customers. Employee understands and acknowledges that the marketing, distribution and sales information and the customer base, including the customers within the Sales and Marketing Region, were established by Company and its predecessors, Osteonics Corp. and Howmedica, Inc., whose orthopedic sales operations are now owned by and conducted by Company, over a period of several years, that this information and

575678.02

client base, and the information necessary to service Company and its customers, are confidential and proprietary, that Company has taken and will continue to take measures to maintain its confidentiality, that Company and its predecessors have expended substantial sums to develop the Sales and Marketing Region and its customer base, and that once provided with the confidential information possessed by Company with respect to its Sales and Marketing Region and its customers, Employee may have primary responsibility for Company's contact with the Sales and Marketing Region and such customers. Employee fully understands that he/she is prohibited from disclosing this confidential information and that such disclosures will irreparably harm the Stryker Implant Group and that money damages are an incomplete and unsatisfactory remedy for such harm. This confidential information is defined in the Employee Confidentiality Agreement being signed by Employee simultaneously herewith (the "Employee Confidentiality Agreement") and is extremely valuable to the Stryker Implant Group. Employee further acknowledges that he would not be given access to this confidential customer information without Employee's express consent to the covenants contained in this Agreement and the Employee Confidentiality Agreement.

Therefore, to ensure that Employee will not compromise the confidentiality of the Stryker Implant Group confidential information and/or unfairly compete with Company by using confidential information relating to Company's Sales and Marketing Region and its customers, Employee agrees as follows:

1. Employee shall not, during the course of his/her employment with Company and for a period of up to one (1) year (determined as provided in Paragraph 2 hereof) following the termination of Employee's employment with Company (regardless of whether Employee's termination is voluntary or involuntary, or with or without cause), directly or indirectly, whether as

575678.02

a sole proprietor, partner, venturer, stockholder, director, officer, employee, consultant, agent or in any other capacity:

(a) Engage or participate in any employment or activity competitive with Company. This restriction applies to any competitive employment or activity that is directed to or designed to solicit or divert any of Company's customers and/or that Employee contacted, targeted as a potential prospect or serviced, directly or indirectly, while in the employ of Company (collectively, "Company's Customers"), for Employee's or any Company competitor's benefit.

(b) solicit, attempt to solicit, assist another to solicit Company's Customers, or in any other way, attempt to influence Company's Customers to alter or terminate their business relationship with Company.

(c) induce or influence, or attempt to induce or influence, any person engaged as an employee or agent of the Stryker Implant Group to terminate his/her relationship with the Stryker Implant Group.

During the course of Employee's employment, the restrictions in Paragraphs 1(a) and 1(b) shall not be limited in geographic territory. Following the termination of Employee's employment with Company, the restrictions in Paragraphs 1(a) and 1(b) shall be limited to the Sales and Marketing Region(s) for which Employee had responsibility at any time during the twelve (12) months prior to his/her termination.

2. Upon the termination of Employee's employment for whatever reason (whether voluntary or involuntary or with or without cause), Company shall have the sole and exclusive right to waive enforcement of the post-employment restrictions set forth in Paragraph 1 hereof (the "Restrictions"). Company shall have a period of thirty (30) days after the termination date of Employee's employment (the "Termination Date") to decide whether or not to waive enforcement

575678.02

-4-

of the Restrictions. If Employee does not receive written notice from Company within such thirty (30) day period that Company is waiving enforcement of the Restrictions, then the Restrictions shall begin on the Termination Date and continue until the earlier of (a) thirty (30) days after Employee receives written notice from Company of the termination of the Restrictions, or (b) one (1) year after the Termination Date. Even if Company waives enforcement of or terminates the Restrictions, Employee shall continue to be bound by the terms of the Employee Confidentiality Agreement.

3. (a) Except as provided in Paragraph 3(c) hereof, upon the termination of Employee's employment and in consideration for Employee being bound by and complying with the Restrictions, Company shall make severance payments to Employee on a monthly basis for the period that the Restrictions are in effect, with each monthly payment being equal to one-twelfth of the aggregate compensation as reported on a W-2 or equivalent form (the "Compensation"), paid to Employee by Company for the twelve (12) months preceding the Termination Date (the "Monthly Amount"), except that the first payment shall be as calculated pursuant to Paragraph 3(b) hereof. If upon the occurrence of the Termination Date, Company has been paying Compensation to Employee for less than twelve (12) months, then the average monthly Compensation earned by Employee while employed by Company shall be the Monthly Amount.

(b) The first monthly installment of the Monthly Amount shall be paid on the fifteenth (15th) day of the month after the month in which Employee last received a Compensation payment from Company, and shall be equal to the Monthly Payment multiplied by the number of months or fraction thereof that the Restrictions have been in effect (i.e., if the Restrictions have been in effect for sixty (60) days, the multiplier would be 2, and if Company elected to waive enforcement of the Restrictions by written notice to Employee given fifteen (15) days after the

575678.02

Termination Date, the multiplier would be .5 and no further severance payments would be due). Notwithstanding the immediately preceding sentence, if Company's written notice waiving enforcement of the Restrictions is given within the first ten (10) days after the Termination Date, no severance payments shall be due to the Employee. After the first installment of the Monthly Amount, subsequent monthly installments shall be made on the same day of each successive month while the Restrictions are in effect.

(c) Notwithstanding Paragraphs 3(a) and (b) hereof, no severance payments will be due to Employee if he/she (i) has breached (A) his/her duty of loyalty to Company, (B) the terms and conditions of this Agreement and/or (C) any other agreement with Company, including without limitation the Employee Confidentiality Agreement, (ii) has been terminated for cause, or (iii) otherwise acted in bad faith and/or contrary to law. For purposes of this Agreement, "cause" is defined as any act of gross negligence; repeated, frequent, and/or pervasive negligence in the performance of Employee's duties; willful misconduct by Employee; willful violation of any Company policy; willful failure to perform the duties of Employee's position; any intentional act in competition with or contrary to the interests of the Stryker Implant Group; any breach of Employee's duty of loyalty to Company; excessive absenteeism; any fraudulent act or misrepresentation; any breach of this Agreement or any other agreement with Company, including without limitation Employee's Confidentiality Agreement; any act of bad faith related to Employee's position and the performance of his/her duties; and/or any violation of federal or state law related to Employee's employment or involving dishonesty or moral turpitude.

(d) The fact that Company may not be required to pay or continue to pay the severance payment as a result of the applicability of Paragraph 3(c) hereof shall not affect Company's ability to enforce the Restrictions and the other terms of this Agreement and shall not

575678.02

serve to release Employee from the Restrictions and the other promises he/she has made in this Agreement.

4. The restrictions on the activities of Employee during his/her employment with Company, and following the termination of employment with Company, do not prevent Employee from using generic skills learned while employed by Company in any business or activity which is not in competition with Company, for Employee's or any Company competitor's benefit. In particular, however, Employee is expressly restricted from soliciting business from, or selling competitive products to any customers of Company.

5. Employee understands and agrees that his/her employment or continued employment with Company, access to Company's confidential customer lists, provision of training by Company and his/her compensation plan are sufficient consideration for the promises made by Employee in this Agreement and that the promises made by Employee are necessary for Company's protection.

6. This Agreement is ancillary to the Employment Agreement (and any amendments or renewals to that agreement), if any, which Employee may have with Company. This Agreement does not in any way restrict the right of either Employee or Company to terminate Employee's employment with Company, which (subject to the terms of any Employment Agreement) is an employment at will.

7. Employee agrees that the restrictions imposed in this Agreement are fair and reasonable and are reasonably required for the Stryker Implant Group's protection. To the extent any portion of this Agreement, or any portion of any provision of this Agreement, is held to be invalid or unenforceable, it shall be construed by limiting and reducing it so as to be enforceable to

575678.02

the extent compatible with applicable law. All remaining provisions, and/or portions thereof, shall remain in full force and effect.

8. This Agreement shall, without express mention, be deemed to continue during any periods of renewal of employment of Employee, including but not limited to periods of employment following promotions or transfers, or during any subsequent re-employment of Employee by Company or any other member of the Stryker Implant Group.

9. The protection provided to Company under this Agreement extends to Company's related or associated entities, as well as their successors and/or assigns, and shall be binding upon Employee and upon his/her heirs, executors, administrators and other legal representatives.

10. Employee understands and agrees that any breach of this Agreement will cause Company irreparable harm which cannot adequately be compensated by an award of money damages. As a result, Employee agrees that, in addition to any other remedy Company may have, Company may seek and obtain injunctive relief restraining Employee from directly or indirectly violating this Agreement or from engaging in any activity which compromises the protection afforded to Company by this Agreement without the necessity of posting a bond or other financial assurance.

11. **Employee agrees that any legal action relating to this Agreement and/or Employee's obligations under this Agreement shall be tried by the Court and Employee waives his/her right to a trial by jury.**

12. **Employee consents and agrees that any and all litigation between him/her and Company relating to this Agreement shall take place in the State of New Jersey and Employee expressly consents to the jurisdiction of the federal and/or state courts in New Jersey.**

575678.02

13. This Agreement shall be construed in accordance with and governed for all purposes by the laws of the State of New Jersey, without regard to conflicts of laws principles.

14. Employee represents that he/she is not subject to any agreement or restriction limiting in any way the scope of this Agreement, or in any way inconsistent with any of the promises made by Employee in this Agreement.

15. After termination of Employee's employment and while the Restrictions are in effect, Employee shall notify Company in writing of the name and address of his/her new employer, and shall provide the new employer with a copy of this Agreement.

16. Nothing in this Agreement shall be construed as a waiver of Company's ability to enforce its non-compete agreements against any of its employees or as evidence that the Restrictions are unnecessary for the protection of Company' legitimate business interests.

17. This Agreement cannot be changed, modified or terminated except in a writing signed by Employee, the Vice President of Sales of Company and one of the following: Vice President of Human Resources or the President of Company.

HOWMEDICA OSTEONICS CORP.
D/B/A STRYKER HOWMEDICA OSTEONICS

Dated: 3-2-06

By: *[signature]*
Name: **Michael G. Hulsman**
Title: **Manager, Client Services**

Dated: 2-16-06

*[signature]*
Employee: **Morgan Schilling**

575678.02

-9-